UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| **PHILADELPHIA INDEMNITY INSURANCE COMPANY** | **PLAINTIFF** |
| v. | No. 3:18-cv-847-BJB |
| **NECCO HOLDING COMPANY I, INC., ET AL.** | **DEFENDANTS** |

\* \* \* \* \*

## MEMORANDUM OPINION & ORDER

Necco, a foster-care (or "child-placing") agency licensed in Kentucky, placed Hunter Payton with foster parents, Billy and Travis Embry-Martin. *See* MSJ (DN 40-1) at 1–2.[1] After four-year-old Payton died in the Embry-Martins' care, administrator Alton Cannon sued the Embry-Martins on behalf of Payton's estate in Kentucky state court. *Id.* The Cannon lawsuit alleges that while in the Embry-Martins' care, Payton suffered "physically violent punishment, physical abuse, and denial of food" from both men. *Id.* It further alleged that Necco breached its duty to ensure Payton's care and well-being, and was also vicariously liable for the Embry-Martins' conduct. *Id.*

Philadelphia Indemnity Insurance Company, Necco's insurer, defended Necco and the Embry-Martins in the Cannon suit under a reservation of rights. Complaint (DN 1) ¶¶ 33–34. While that state-court suit remained in discovery, Philadelphia Indemnity filed this federal suit against three sets of defendants: Necco and its corporate affiliates, Cannon as the administrator of Payton's estate, and the Embry-Martins. It seeks a declaratory judgment, under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, that it owes no duty to defend any of the defendants in the state-court proceeding. ¶ 1–2. Philadelphia Indemnity moved for summary judgment, arguing that the Embry-Martins are neither employees nor volunteers and thus fall outside the Policy's coverage. Both questions appear to be novel under Kentucky law.

Under Federal Rule 56(a), Philadelphia Indemnity bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once satisfied, the non-moving party must produce specific

---

[1] KRS § 199.011(6) defines "child-placing agency" as "any agency licensed by the [C]abinet" for Health and Family Services that "supervises the placement of children in foster family homes or child-caring facilities, or which places children for adoption."

1

facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The Court reviews the evidence in the light most favorable to the non-moving party, but the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Could a jury reasonably conclude that the Embry-Martins were either employees or volunteers under the terms of Necco's insurance policy? The unfortunately named "SPAM" provision (short for "sexual or physical abuse or molestation vicarious liability") covers the vicarious liability of "insured" persons for:

> sums that the insured is legally obligated to pay as "damages" because of "bodily injury" to which this insurance applies, if the insured is alleged to be liable for another person's "abusive conduct", by reason of:
> (1) the negligent:
>   (a) employment;
>   (b) selection;
>   (c) investigation;
>   (d) supervision;
>   (e) reporting to the proper authorities, or failure to so report; or
>   (f) retention;
>     of any "employee", volunteer or any other person or persons for whom the insured is or ever was legally responsible[.] Policy (DN 1-2) at 431.

Necco is an "insured," and the Policy covers its liability arising from its negligence in connection with any abusive conduct by its employees and volunteers, so long as that liability "aris[es] within the scope of their [employment or volunteer] duties." *Id.* at 432. The SPAM provision defines "employee" as a "leased worker" or "temporary worker." *Id.* at 435.[2] And the umbrella-liability policy, which SPAM modifies, defines "volunteer worker" as "a person who is not your 'employee,' and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you." *Id.* at 781 ¶ 26.

The Embry-Martins contend they were employees: Necco paid them to care for Hunter Payton and exercised a great deal of control over their duties as foster parents. Embry-Martin Response (DN 47-1) at 2. Alternatively, they contend that Necco's payments amount to reimbursements for the foster child's expenses, such

---

[2] A "leased worker" is one whom is "leased to [the insured] by a labor leasing firm, … to perform duties related to the conduct of [Necco's] business." Policy at 435. A "temporary worker" is a substitute for a permanent employee. *Id.*

2

that the Embry-Martins would qualify as volunteers who "donat[ed] their time and labor." *Id.*

Both parties agree that Kentucky law governs this dispute. *See* Compl. ¶ 38 (citing Kentucky law); Embry-Martin Response at 4–5 (same). Kentucky courts will "enforc[e] as written" unambiguous and reasonable contractual terms. *Foreman v. Auto Club Property-Casualty Ins. Co.*, 617 S.W.3d 345, 349 (Ky. 2021). But "[a]mbiguous terms and the language of exclusions are strictly construed against the insurer." *Id.* at 349–50.

\* \* \*

Whether the Embry-Martins are employees under the Policy is relatively clear: both the Policy's definition and the common law indicate they are not. No one contends the Embry-Martins were either "leased workers" or "temporary workers" under the contractual definition. Policy at 435.

But the parties agree that the SPAM definition isn't exclusive; if the Embry-Martins qualify as employees under the Kentucky common law, then the SPAM would also cover them. MSJ at 13 (conceding a person is an employee if he comes within "the Policy *or* common law definition of that term") (emphasis added). So the Court considers how the term is defined under the case law in similar contexts. Surprisingly, the employment status of foster parents remains a novel issue of Kentucky law. But Kentucky law has developed two tests courts use to determine employee status. Courts developed one in workers' compensation cases, and the other in employment-discrimination cases. The first considers several factors:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) [t]he kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g)  the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer; and

3

> (i) whether or not the parties believe they are creating the relationship of master and servant.

*Ratliff v. Redmon*, 396 S.W.2d 320, 324–25 (Ky. 1965). Of those factors, four are "predominant"—"(1) the nature of the work as related to the business generally carried on by the alleged employer; (2) the extent of control exercised by the alleged employer; (3) the professional skill of the alleged employee; and (4) the true intent of the parties." *Uninsured Employers' Fund v. Garland*, 805 S.W.2d 116, 118–119 (Ky. 1991).

For employment-discrimination cases under the Kentucky Civil Rights Act, Kentucky has adopted a Sixth Circuit test. *See Steilberg v. C2 Facility Sols., LLC*, 275 S.W.3d 732, 735 (Ky. App. 2008) (citing *Shah v. Deaconess Hosp.*, 355 F.3d 496 (6th Cir. 2004)). This multi-factor test derives from the common-law doctrine of agency. The factors, none of which are decisive, include:

> (i) the hiring party's right to control the manner and means by which the product is accomplished;
>
> (ii) the skill required by the hiring party;
>
> (iii) the duration of the relationship between the parties;
>
> (iv) the hiring party's right to assign additional projects;
>
> (v) the hired party's discretion over when and how to work;
>
> (vi) the method of payment;
>
> (vii) the hired party's role in hiring and paying assistants;
>
> (viii) whether the work is part of the hiring party's regular business;
>
> (ix) the hired party's employee benefits; and
>
> (x) tax treatment of the hired party's compensation.

*Shah*, 355 F.3d at 499–500 (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1994)). Whether a person is an employee under these tests is a question of law for the judge to decide, assuming the facts are not genuinely disputed. *Uninsured Employers' Fund*, 805 S.W.2d at 117; *see also Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011).

Neither the Kentucky courts nor the Sixth Circuit has applied these tests to consider whether foster parents are employees of the placement agencies that paired them with their child. But other courts have applied similar tests to this precise

4

question. And those decisions have overwhelmingly concluded that foster parents are not "employees" of the agency.

One recent case involved Necco itself and the same contractual language at issue here. In *Blankenship v. Necco, LLC*, the Fourth Circuit applied a multifactor test under West Virginia law (which resembles Kentucky's), focused predominantly on the element of "control" under Necco policies and procedures, and persuasively held that Necco wasn't vicariously liable for the actions of the foster parents. 780 F. App'x 32, 33 (4th Cir. 2019).[3] The foster parent had "not produced more than a scintilla of evidence indicating that Necco has the power to control the process of child rearing to the degree necessary to establish an employer-employee relationship." *Id.* at 35. True, state law imposed "broad requirements" reflected in Necco's agreements with its foster parents, including Necco's obligation to outline an individual plan for each foster child. But the agency lacked control over how foster parents satisfied those requirements to, for example, ensure that each foster child received clothes, medical treatment, education, and opportunities for religious development. *Id.* Neither Necco's contract nor its handbook permitted the agency to "dictate the manner in which foster parents provide those necessities." *Id.*[4]

The same conclusion becomes apparent in examining this case under the factors identified as "predominant" under Kentucky's *Ratliff-Garland* test. The "nature of the work" relative to the alleged employer's business weighs slightly against an employment relationship. *Garland*, 805 S.W.2d at 119. Necco's business is not to provide care for foster children but to place them with suitable parents, who perform a distinct task. The extent of control also militates against an employee relationship. As the *Blankenship* court explained, Necco's high-level standards left the Embry-Martins with the specific day-to-day control over child-rearing. 780 F. App'x at 35. The Embry-Martins cite seven requirements from their agreement with Necco (the "subagreement for foster family care for children," DN 47-3) to show Necco's degree of control. But these requirements are neither as "detailed" nor

---

[3] Under West Virginia law, whether an agent is an employee depends on four factors: "(1) Selection and engagement of the servant; (2) Payment of compensation; (3) Power of dismissal; and (4) Power of control." *Blankenship*, 780 F. App'x at 34 (quoting *Shaffer v. Acme Limestone Co.*, 524 S.E.2d 688, 695 (W. Va. 1999)). Absent from this test is consideration of "the true intent of the parties," which is another predominant factor under Kentucky law. *Garland*, 805 S.W.2d at 119.

[4] *See also I.H. v. County of Lehigh*, 610 F.3d 797, 810–11 (3d Cir. 2010) (foster parents are not employees of placement agency because "considerable latitude" in meeting goals imposed by federal and state law, among other requirements, meant it would be "improvident and unworkable to interject an element of the [foster agency's] control into such a relationship") (quotation omitted); *Williamson v. Crossroads Programs, Inc.*, 2011 WL 2410239, at *4 (Super. Ct. N.J. 2011) (under New Jersey's single-element "control" test, no employer/employee relationship existed because the employer "retains the right to choose not only what is done, but *how* it is done").

"restrictive" as Embry-Martin contend. Embry-Martin Response at 7–8. The agreement requires the Embry-Martins merely to "comply with the *general* supervision and direction of the Agency." *Id.* at 7 (emphasis added). Other requirements likewise derive from state regulations. *See* 922 KY. ADMIN. REGS. 1:310, §§ 6 & 12. And even these requirements didn't tell the Embry-Martins how to parent the children in their custody: rather, they required the Embry-Martins to report specific events such as sickness or some out-of-state visits, and to allow Necco's social worker to "visit with the child." Embry-Martin Response at 7–8; *I.H. v. County of Lehigh*, 610 F.3d 797, 810 (3d Cir. 2010) (foster-agency and state-imposed requirements allowed foster parents "considerable latitude" in fulfilling state goals).

Neither party gave much attention to the third predominant factor—the "professional skill of the alleged employee." *Garland*, 805 S.W.2d at 119. For good reason: it is hardly obvious what "professional skills" foster parenting requires. Presumably that is a task undertaken by people of all vocations and walks of life.

Last, the "true intent of the parties" weighs against an employment finding. Although the Embry-Martins allegedly believed they were Necco's employees, Necco's handbook clearly distinguished foster parents from employees: "Necco employees are not eligible to be foster parents with the agency." DN 40-5 at 5.[5] This is consistent with Kentucky statutory law, which expressly exempts foster parents from the definition of "employee" under the state wage-and-hour laws. KRS § 337.010(2)(a)(11). Additionally, Necco's rule prohibiting its employees from serving as foster parents conforms with state regulations that require foster agencies to develop policies and procedures to prevent potential conflicts of interest or misuse of influence. 922 KY. ADMIN. REGS. 1.1310, § 4(9)(b).

Other factors discussed less prominently in *Ratliff* also suggest the Embry-Martins are not employees. The Embry-Martins, rather than Necco, choose their own "instrumentalities, tools, and the place of work." *Ratliff*, 396 S.W.2d at 324. Necco reimbursed the Embry-Martins for expenses and didn't require expense reports. Embry-Martin Response at 8–9. And the monthly per diem stipend wasn't tied to hours "worked," but instead to the foster parents' overall responsibilities. *Ratliff*, 396 S.W.2d at 326 ("If payment is made by the hour or for a period, we may look for an employee."). Stipends paid to foster parents have not been enough, according to other courts, to confer employee status. *See In re Sedillo*, 476 B.R. 619, 625 (Bankr. D. Colo. 2012) (debtor's foster-parent status did not constitute a "gainful occupation" because she received reimbursement funds, not compensation or profit); *DeWater v.*

---

[5] Necco's rules govern interactions between its employees and foster children. Those rules don't "uniformly prohibit employees from becoming foster parents *with other agencies*," DN 40-5 at 5, but "[e]mployees are expected to notify their supervisor prior to adopting a child who has received services from Necco," *id.* at 6.

*State*, 921 P.2d 1059, 1063 (Wash. 1996) ("foster care payments are not considered as income;" they "are reimbursement for childcare, rather than payment of wages"). In any case, the per diem alone wouldn't alter the balance of the factors discussed above regarding the Embry-Martins' employment status.

\* \* \*

Their volunteer status remains much hazier, however. The parties' briefing is thin and caselaw is nonexistent. Worse yet, the parties address only the word "volunteer" without paying attention to the superficially more applicable contractual language that follows: "or any other person or persons for whom the insured is or ever was legally responsible." Policy at 431. Or to the definition of "volunteer," found in the neighboring umbrella-liability section, that appears to incorporate aspects of the common-law employment test (or tests) discussed above. *See* Policy at 781 ¶ 26..

\* \* \*

Equally worrisome, no party addressed the threshold issue whether the Court should take jurisdiction to issue a declaration in the first place. The Declaratory Judgment Act and the Federal Rules of Civil Procedure of course *allow* federal district courts to issue declaratory injunctions, including in insurance-coverage disputes such as this. *See, e.g.*, *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 550–51 (6th Cir. 2008). But Congress and the Rules do not *require* courts to issue declarations. For "a case of actual controversy within its jurisdiction," a federal court "*may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201 (emphasis added).

Courts have interpreted this statute "to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). In other words, where a federal court has jurisdiction to decide a declaratory judgment action, "it must also determine whether it *should* do so." *Grange Mut. Cas. Co. v. Safeco Ins. Co. of Am.*, 565 F. Supp. 2d 779, 785 (E.D. Ky. 2008). Among the relevant considerations are whether a declaratory judgment would "serve a useful purpose in clarifying and settling the legal relations in issue" or "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Grand Trunk W. R.R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (quotation omitted). Courts in the Sixth Circuit also ask, before issuing a declaration, whether "the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata,'" "whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction," and whether "an alternative remedy [would be] better or more effective." *Id.*

No set weight applies to each factor, and "the factors are not always considered equally." *Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 29 F.4th 792, 797 (6th Cir. 2022). Instead, these factors reflect three main considerations: "efficiency, fairness, and federalism." *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014); *see also Erie Property & Casualty Ins. Co. v. Moore*, No. 3:19-cv-332, 2021 WL 3282133, at *7–8 (W.D. Ky. July 30, 2021). For instance, "a relatively efficient declaratory judgment (factors 1, 2, and 5) could very well be inappropriate if hearing the case would be unfair (factor 3) or would offend the bundle of principles we generally label 'federalism' (factor 4)." *Hoey*, 773 F.3d at 759.

How would this Court's decision of a novel, unbriefed, and potentially non-dispositive question provide the parties with the requisite clarity and certainty that support a declaratory judgment? Philadelphia Indemnity hasn't made clear why its reading of the Policy is correct *or* why this Court's resolution of this state-court-adjacent question is appropriate and efficient. Indeed, a decision from this Court would not settle the broader controversy or serve a useful clarifying purpose, and likely would increase the tension between it and the ongoing state-court proceeding. Meanwhile, based on the limited information before this Court Philadelphia Indemnity may seek the same or similar relief in the state-court suit through a declaration from the court already handling its dispute—a superior remedy along most every axis. So the Court declines to exercise jurisdiction under the Declaratory Judgment Act.

The first and second factors counsel against a declaration. The declaratory judgment would not "settle the *underlying* state-court controversy," nor would it necessarily "clarify the legal relationship between the parties in the underlying state-court controversy." *Id.* at 760. The "controversy between the parties in the declaratory-judgment action—that is, between the insurer and the insured," *id.* at 760, reflects "the competing policy considerations of consolidating litigation into one court" against the efficiency interest in "permitting a party to determine its legal obligations as quickly as possible," *Flowers*, 513 F.3d at 555.

Philadelphia Indemnity isn't a party in the state-court lawsuit, though is actively defending the case. The scope of its coverage apparently isn't (yet) an issue there. *Cf. United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 397 (6th Cir. 2019) (the plaintiff and defendant were "the only parties currently litigating the issue of insurance coverage, and a declaratory judgment resolves that issue"). And a declaratory judgment on volunteer status may not "settle the controversy regarding the scope of insurance coverage" between Philadelphia Indemnity, Necco, and the Embry-Martins. *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003). Settling employee and volunteer status doesn't automatically exclude this third category, which the parties fail to address altogether. So issuing a declaration wouldn't necessarily settle the issues or "clarify the legal relations" between the parties. *Grand Trunk*, 746 F.2d at 326.

8

The third factor—whether the declaration is used for procedural fencing or to provide an arena for a race for res judicata—"usually does not weigh heavily in the analysis." *United Specialty*, 936 F.3d at 399. If no evidence suggests procedural gamesmanship, district courts treat this factor as neutral. *See Cardinal Health*, 29 F.4th at 797 (declining to hold that the absence of procedural fencing favors exercising jurisdiction). No such evidence exists here, rendering this factor neutral. *See Flowers*, 513 F.3d at 558 (no evidence for third factor when plaintiff "was not a party to the state court action" and "issue of its insurance coverage … was not before the state court") (quotation omitted).

The fourth factor—friction between federal and state courts—contains three subfactors:

(1) whether the underlying factual issues are important to an informed resolution of the case;

(2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and

(3) whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

*Cardinal Health*, 29 F.4th at 799 (quotation omitted). Although the first subfactor favors jurisdiction, the second and third strongly tilt against it.

This insurance dispute appears to involve a basic question of contract interpretation, so the underlying factual issues are not necessarily critical for resolution. *See Northland*, 327 F.3d at 454. While the second subfactor focuses the Court on factual issues, the Court may also consider whether the federal or state court would be better situated to resolve "novel questions of state *law*." *Cardinal Health*, 29 F.4th at 799 (quotation omitted) (emphasis added). Generally, "state courts are in a better position to resolve insurance issues governed by state law," and "this subfactor leans even more heavily against federal courts exercising jurisdiction" where that issue is novel. *Mass. Bay Ins. Co. v. Christian Funeral Directors, Inc.*, 759 F. App'x 431, 440 (6th Cir. 2018).

That is true here. Philadelphia Indemnity asks the Court to resolve whether foster parents qualify as employees or volunteers of a foster agency under the insurance policy that Philadelphia Indemnity issued to the agency. No Kentucky court has applied Kentucky's common-law employment tests to examine whether foster parents are employees. As to the volunteer question, the Court has far less to go on, even by way of background law. There is a "troubling lack of clearly-settled Kentucky precedent" on this issue, given that the Court is not aware of *any* Kentucky decisions defining volunteer in a similar context. *Travelers Indem. Co. v. Bowling*

9

*Green Pro. Assocs., PLC*, 495 F.3d 266, 273 (6th Cir. 2007); *see also Bituminous Cas. Corp. v. J&L Lumber Co., Inc.*, 373 F.3d 807, 815–16 (6th Cir. 2004) ("Where as here, there are two potential unresolved questions of state law concerning state regulated insurance contracts, this consideration weighs against exercising jurisdiction."). And because Kentucky courts have significant advantages in interpreting a novel issue of state law, the second subfactor favors declining jurisdiction.

The third subfactor requires the Court to consider any "close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action." *Cardinal Health*, 29 F.4th at 799. This too weighs heavily against exercising jurisdiction. A decision on whether foster parents are employees or volunteers could have ramifications (many unforeseen) for all foster parents in the Commonwealth. And foster care is an important state interest, as indicated by the statutory and regulatory framework that governs this system. *See, e.g.*, KRS § 199.640(1), (5); 922 KY. ADMIN. REGS. 1.310. Although this Court's decisions would have only persuasive value beyond this case, the possibility of disrupting the relationship between foster agencies and foster parents creates serious federalism concerns.

And a "close nexus" exists between these legal issues and a second area of state public policy. Philadelphia Indemnity is an insurance agency. As the Sixth Circuit has recognized, "states regulate insurance companies for the protection of their residents, and state courts are best situated to identify and enforce the public policies that form the foundation of such regulation." *Bituminous*, 373 F.3d at 815 (quotation omitted).

Lastly, alternative remedies. Kentucky too allows declaratory judgments in its courts. *See* KRS § 418.040. A state declaratory judgment "has the advantage of allowing the state court to apply its own law" and is thus superior to a federal court declaration. *United Specialty*, 936 F.3d at 401. This is especially so when Kentucky precedents do not "provid[e] clear guidance" on the issue. *Flowers*, 513 F.3d at 562. So this factor too counsels against exercising jurisdiction.

\* \* \*

After reviewing the five *Grand Trunk* factors, the Court concludes that they counsel against exercising jurisdiction. The efficiency interest in resolution of this insurance dispute merits serious consideration, and the Court is sympathetic to the notion of starting over in state court. But a declaration in this case is unlikely to end the dispute between the parties, and federalism concerns counterbalance any advantage that a federal court may bring. Faced with a novel area of state law, a dearth of precedent, and Kentucky's interests in regulating its foster-care system and insurance agencies, the Court concludes that a Kentucky court is better situated to resolve this dispute.

Accordingly, the Court declines to exercise its discretion under the Declaratory Judgment Act, 28 U.S.C. § 2201, denies Philadelphia Indemnity's motion for summary judgment (DN 40), and dismisses the complaint.

Benjamin Beaton, District Judge
United States District Court

June 3, 2022